Larry G. BROADDUS, Appellant,

v.

FIRST STATE BANK OF BRYSON, Texas, Appellee.

No. 2–84–029–CV.

Court of Appeals of Texas, Fort Worth.

Dec. 12, 1984.

---

Winstead, McGuire, Sechrest & Minick, and Courtenay L. Bass, Dallas, for appellant.

Montgomery Law Firm, and Elton M. Montgomery, Graham, for appellee.

Before FENDER, C.J., and HUGHES and JORDAN, JJ.

## OPINION

FENDER, Chief Justice.

This is an appeal from a judgment in favor of the appellee (hereinafter Bank), the payee of a promissory note, and against appellant (hereinafter Broaddus), the maker. Broaddus raises various points of error having to do with the validity of the verdict and the conformity of the judgment thereto.

We affirm.

The underlying facts in this case are somewhat complicated and involve several different transactions spanning a period of about a year and a half. The first transaction concerned a promissory note in the sum of $4,749.08, signed by Broaddus on March 4, 1974 and made payable to the Bank. Charles Curtis, the then president of the Bank, (hereinafter Curtis) had arranged a meeting with Broaddus in order to get him interested in buying Maine-Anjou cattle at a sale in Fort Worth. The meeting occurred at a dance the night before the sale of the cattle. Broaddus testified that Curtis told him the cattle would be of a certain quality and that he (Curtis) would help him get started in the business. Broaddus also stated that Curtis had told him that financing for the cattle could be arranged through the Bank, and that the cattle to be purchased could stand as collateral for the loan. At the sale, which took place in Fort Worth, Broaddus bought four or five head of cattle from a third party for $4,150. Broaddus agreed to have Curtis take care of the cattle on Curtis's ranch and to pay him for that service.

The signing of the March 4 note to finance this sale took place in Dallas. Terrel Taylor, Curtis's brother-in-law, brought the note to Broaddus there for him to sign it, and then brought it back to Bryson, where the Bank is located. The funds advanced by the Bank in exchange for the note and the security interest in the cattle were never given directly to Broaddus; instead, the funds were paid directly to the seller of the cattle.

Joining Broaddus in the purchase of these cattle was Taylor. The two formed a company with Taylor acting as a go-between between Curtis (the cattle were kept at his ranch in Jacksboro) and Broaddus (who resided in Dallas). Later, a Dr. Coleman from Dallas joined the company.

The second note in question originated from the company's purchase of 20 head of cattle directly from Curtis, in August, 1974. Although the company, consisting of Broaddus, Taylor and Dr. Coleman, actually owned the cattle, the financing was done by the three men in their individual capacities, in order to obtain a greater amount of credit. This purchase was preceded by a meeting in Curtis's office at the Bank's premises in Bryson. During the meeting Curtis made certain representations about the cattle which turned out to be untrue. Present at the meeting were appellant, Dr. Coleman, Taylor and Curtis. As in the first purchase, it was agreed that the cattle would be maintained by Curtis on his ranch.

After this meeting, Broaddus, on August 27, 1974, signed a note for $13,000 payable to the Bank. Three days later, on August 30, the loan proceeds were deposited directly into the account of Curtis. As in the case with the first note, the Bank took a

security interest in the cattle which Broaddus had purchased.

The note for $4,749.08 and the note for $13,000 were later consolidated into one note in March, 1975, by which time Curtis had sold his interest in the bank. At the time that the first note was signed (March, 1974), Curtis was the president, a director, chairman of the board and controlling stockholder of the Bank. He also had authority to review and approve loans. At the time of the second note of $13,000 (August, 1974), Curtis had essentially the same status and authority, except he was no longer president.

The record shows that Broaddus made several payments on his notes, going both to principal and interest. The last such payment was made September 29, 1975. Shortly thereafter a Wichita Falls bank foreclosed on all the cattle which Curtis had on his ranch. This bank, which had loaned money to Curtis in 1973 and 1974, was given a security interest in all the cattle. When Broaddus learned of this foreclosure he ceased making payments to the Bank on the consolidated promissory note. The Bank subsequently brought this suit.

Broaddus claimed in his defense that Curtis committed fraud in the sale of the cattle by misrepresenting the cattle quality. He further claimed that such fraud could be imputed to the Bank on one of two alternate theories: (1) Curtis as agent of the Bank; or (2) Curtis as sole representative of the Bank.

The Bank claimed these defenses were improper as a matter of law. It contended that any fraud by Curtis could not properly be imputed to it on either the agency or sole representative rationales.

The trial court permitted the submission of special issues bearing on these two theories. However, the record indicates that the trial court was not sure about their validity in this case, and that he wished to reserve a ruling on them even though he would submit them to the jury.

Twelve special issues were submitted to the jury. To the following five questions the jury gave the indicated unanimous answers:

1. Did Curtis misrepresent the quality of the cattle? Yes.
2. Was Curtis the Bank's agent when he made such misrepresentations? No.
3a. Did Broaddus receive consideration (loan proceeds) for the first note it made? Yes.
4. The Bank's attorney fees. $5,466.
5. Was Curtis the sole representative of the Bank in regards to Broaddus's procurement of the first note? Yes.

To the following eight questions, the jury gave the indicated answers based on the votes of ten jurors; however, the jury foreman stated the answers were not based on the votes of the same ten jurors:

3b. Did the Bank advance consideration (loan proceeds) upon execution of the second note? No.
6. Was Curtis the sole representative of the Bank in regards to Broaddus's procurement of the second note? Yes.
7. Did Curtis commit fraud in connection with Broaddus's signing of the first note? Yes.
8. What amount of money will compensate Broaddus for Curtis's fraud in #7? 0.
9. Did Curtis commit fraud in connection with Broaddus's signing of the $13,000 note? Yes.
10. What amount of money will compensate Broaddus for the fraud in #9? $4,119.
11. Did the Bank sue Broaddus with knowledge of Curtis's fraud in connection with Broaddus's signing of the $4,749 note? Yes.
12. What amount of money should be awarded to Broaddus as exemplary damages? $8,000.

About a year after this verdict the trial court rendered his judgment. It was based solely on those five answers to which there

had been unanimous jury agreement. The other eight answers were disregarded.

The judgment was in favor of the Bank, and it ordered Broaddus to pay the principal amount on the two notes, accrued interest and attorney's fees.

Broaddus's eight points of error essentially raise two questions: (1) was it proper for the trial court to disregard the eight non-unanimous answers in rendering the judgment, and (2) assuming those answers were properly disregarded, do the five unanimous answers support the verdict?

■ There was no reversible error in the trial court's decision to disregard the eight non-unanimous answers. These answers (except for 3b on consideration) were rendered immaterial by special issue 2 which found there was no agent-principal relation between Curtis and the Bank and by the trial court's implicit rejection as a matter of law of the sole representative doctrine. Thus it became immaterial to the Bank's cause of action whether Curtis had committed any fraud, and those non-unanimous answers (except for 3b) were properly disregarded. *King v. Smith,* 459 S.W.2d 202 (Tex.Civ.App.—Corpus Christi 1970); *Teas v. Republic National Bank of Dallas,* 460 S.W.2d 233 (Tex.Civ.App.—Dallas 1970, writ ref'd n.r.e.).

The second question raised by Broaddus's points of error is whether the judgment is in fact supported by the five answers considered, especially since in special issue 3b the jury found that Broaddus had not received consideration on the second note.

■ A review of the record indicates there is no evidence to support the jury's finding in 3b, and thus it was proper for the trial court to disregard it as immaterial. Furthermore, it was proper for the trial court to find as a matter of law that there was consideration for the second note. Broaddus argued at trial that he received no consideration on the second note because the loan proceeds were never actually deposited in his account. Broaddus introduced into evidence a deposit slip which

indicated that a few days after he signed the second promissory note, the Bank transferred the funds into the account of Curtis, without such funds ever having been placed in Broaddus's account.

It was not necessary that the loan proceeds be deposited in Broaddus's account. In his charge to the jury, the trial court defined "consideration" as benefit conferred to Broaddus or detriment incurred by the Bank. Broaddus signed the second note to finance the purchase of cattle from Curtis. The Bank, by advancing the funds, incurred a detriment. Thus, special issue 3b was properly disregarded by the trial court.

We hold that the judgment was supported by the evidence in the record and the jury's partial verdict.

Judgment is affirmed.